**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**MARINA PDR OPERATIONS, LLC,**

Plaintiff,

v.

**SEVERIANO LÓPEZ-MARRERO,**
**JANE LÓPEZ-MARRERO,**

Defendants.

Civil No. 24-1064 (MBA)

# OPINION AND ORDER

This case arises out of damages sustained by Defendant Severiano López-Marrero's ("López-Marrero") vessel, which was dry-stacked at Marina PDR Operations LLC ("Marina PDR"). Plaintiff Marina PDR filed suit requesting a declaratory judgment finding: (1) Defendant López-Marrero lacks standing to bring action against Marina PDR for damages to his vessel; (2) López-Marrero waived all rights and assumed all risk for damages which the vessel may have suffered while at the marina; and (3) Marina PDR is not liable for the damages to the vessel as López-Marrero certified having inspected the cradles and racks, accepted them as they were, and held Marina PDR harmless from any such damages. (ECF No. 1). López-Marrero filed a Counterclaim requesting the opposite conclusions from the Court. (ECF No. 6). Pending before the Court is Marina PDR's Motion for Summary Judgment, (ECF No. 41), and López-Marrero's Opposition. (ECF No. 47). For the reasons set forth below, Marina PDR's Motion for Summary Judgment is hereby **GRANTED**.

## BACKGROUND[1]

On December 2, 2022, Marina PDR and López-Marrero executed a Vessel Space License Agreement ("the Agreement") for the dry-stack storage of López-Marrero's 2020 Scout 380 LXF at the Puerto del Rey Marina in Fajardo, Puerto Rico. (ECF Nos. 40 at 2; 46 at 1). Section 19[2] of the

[1] López-Marrero failed to comply with Local Rule 56(c). "[A] party's denial or qualification of a proposed fact must be strictly limited to the issue therein raised. Any additional information shall be included in a separate section in order to ease the Court's task." *Acevedo-Padilla v. Novartis Ex Lax, Inc.*, 740 F. Supp. 2d 293, 298 (D.P.R. 2010), *rev'd and remanded on other grounds sub nom. Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128 (1st Cir. 2012). "Under Local Rule 56, a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated when the statements contained in the movant's Statement of Uncontested Facts are not properly controverted." *Id.* (cleaned up). The First Circuit has consistently warned "litigants ignore [Local Civil Rule 56] at their peril." *Caban Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 7 (1st Cir. 2007). The Court has nonetheless ferreted through the record in search of any disputed facts.

[2] Section 19 of the Vessel Space License Agreement reads in full as follows:

> Owner agrees to purchase and maintain insurance against such risks as Owner deems prudent and shall look only to said insurance for compensation or damages related to any losses regardless of responsibility, subject to the provisions of this paragraph. At a minimum, Owner shall at all times during the Term maintain, with Lloyds of London or an insurance company with a Best rating of A or higher: (i) a Protection and Indemnity policy of insurance with limits of not less than $1,000,000 for vessels over 50' and $500,000 for vessels 49' and under (for vessels in wet slip and land storage) or $300,000 (for vessels in dry stack), in all cases with a deductible of not more than $10,000 per occurrence, naming Sun Communities, Inc. and its affiliates and subsidiaries as additional insureds, with coverage for accidental fuel spills and salvage and wreckage removals, and (ii) a Hull and Machinery policy covering at least 100% of the present actual cash value of the Vessel or the value of its indebtedness to any financing institution, whichever is higher, with endorsements for extended perils, damage by fire, vandalism and burglary. Such limits of insurance are minimum requirements only and are not intended in any way to limit the insurance available under such insurance policies or Owner's liability. Upon execution of this Agreement and as requested by PDR from time to time, Owner shall provide PDR with a certificate of insurance evidencing required coverage and shall produce evidence of the renewal of the policies no later than 30 days prior to their expiration. All policies of insurance shall require 30 days' advance notice by the insurance company to PDR of any amendment or

Agreement requires the owner of the vessel to purchase and maintain insurance; and includes a waiver of responsibility releasing Marina PDR from liability, except to the extent a claim is for Marina PDR's sole negligence, gross negligence or willful misconduct. (ECF Nos. 40 at 3; 40-1 at 3; 46 at 7). Sections 20 to 32 of the Agreement cover liability. Section 20[3] of the Agreement similarly exempts Marina PDR

> cancellation; this endorsement, with a copy of the policy, shall be delivered at the Marina Office or sent to PDR at: 4900 carr. 3 KM 51.4, Fajardo, Puerto Rico 00738, or by email to insurance@puertodelrey.com. Failure to carry adequate or proper insurance or the agreed endorsement will be reason for immediate termination of this contract. If insurance is inadequate or cancelled by client, owner will be deemed to be self-insured. Owner specifically waives all rights of recovery against the PDR Parties. Where the policy permits a waiver of subrogation where required by written contract, Owner specifically waives on behalf of Owner and Owner's insurers, all rights of subrogation against the PDR Parties; EXCEPT TO THE EXTENT A CLAIM IS CAUSED BY THE SOLE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PDR PARTIES. Without limitation of any other terms contained in this Agreement, the provisions of this paragraph shall survive notwithstanding the termination or expiration of this Agreement for as long as the Vessel remains on Marina premises. PDR may revoke this agreement for Owner's failure to properly insure Vessel.

(ECF No. 40-1 at 3; 46 at 7).

[3] Section 20 of the Vessel Space License Agreement reads in full as follows:

> Owner agrees that Safe Harbor Marinas, LLC, SHM TRS, LLC, and their respective parents, affiliates and subsidiaries, and the directors, officers, owners, shareholders, agents, employees and representatives of each of the foregoing (collectively, the "PDR Parties") shall not have any liability of any kind to the Owner Parties or any other party claiming by, through or under Owner for, and Owner, on behalf of Owner and all such parties, hereby forever releases the PDR Parties from any claim or responsibility for, and forever waives the right to assert, make or commence any claim, demand, action or proceeding in respect of or in connection with, the following, no matter how occurring: (i) any injury to persons (including death), (ii) damage to or destruction, loss, loss of use, or theft of any property (including the Vessel), or (iii) damages of any other kind (each of the foregoing, a "Loss"), no matter how such Loss was caused, including whether

from claims of ordinary negligence. (ECF Nos. 40 at 3; 40-1 at 3; 46 at 8). Section 21 includes an indemnity provision in favor of Marina PDR. (ECF Nos. 40 at 3-4; 40-1 at 3; 46 at 10). Crucially, Section 22 limits Sections 20 and 21, and specifies that "the obligations of owner under paragraphs 20 and 21 shall be enforceable even if damages or claims arise out or in connection with the negligence or fault of the PDR parties, but not to the extent caused by the sole negligence, gross negligence, or willful misconduct of the PDR parties, which may not be presumed and must be affirmatively established." (ECF Nos. 40 at 4; 40-1 at 3; 46 at 4). Section 29 states that "PDR assumes no responsibility and shall not be liable for the care, protection or security of the vessel, or its appurtenances at any time . . . . This is not a bailment contract." (ECF 40-1 at 4).

In the Section titled "Dry Stack & Haul Out," Section 34[4] of the Agreement imposes a responsibility on the owner of the vessel to verify that the assigned cradle or rack is suitable for the

---

> caused by casualty, electrical shock, electrical shock drowning, interruption of or interference with utilities, theft, fire, actions of third parties, collision, allision, chafing, dock maintenance or faulty repair, relocation of the Vessel, side-tying or rafting the Vessel with other vessels, inaccessibility of the Vessel, or any other matter or cause (including any hazardous weather, natural disaster, or other act of God), EVEN IF SUCH CLAIMS AROSE OUT OF OR IN CONNECTION WITH THE NEGLIGENCE OR FAULT OF THE PDR PARTIES.

(ECF Nos. 40-1 at 3; 46 at 8).

[4] Section 34 of the Vessel Space License Agreement reads in full as follows:

> Dry Stack storage rate includes in/out once per day, and boat washing and repair once per week each, depending on availability; PDR reserves the right to charge Owner for additional use of the foregoing services. Vessels should not be let unattended at launch docks. PDR shall not be liable for normal wear and tear of dry stack operations which may result in minor scratches and wear of hull. Owner is responsible for verifying that assigned cradle or rack is suitable for the Vessel. By executing this Agreement, Owner certifies that he/she has inspected (and will inspect from time to time) the assigned cradle/rack and

vessel; certifies that the owner inspected the assigned cradle/rack and it conforms to vessel manufacturer's recommendations for dry storage; places on the owner of the vessel all responsibility for damage to the vessel from placement of slings, forks, blocks, racks, cradles or jackstands in the absence of Plans; and holds Marina PDR harmless from any such damages. (ECF Nos. 40 at 2; 40-1 at4; 46 at 2). Section 43 further specifies that "[t]he person named custodian [of the vessel] has the exclusive responsibility, care, custody, control and access to the Vessel, its gear, equipment, contents and personal prope1iy at all times. PDR does not offer and does not provide Custody services." (ECF No. 40-1 at 4).

The Scout Owner's Manual warns that improper cradle or lift support can damage hulls. (ECF Nos. 40 at 4; 46 at 12). In 2023, the parties learned that López-Marrero's vessel had hull cracks. (ECF Nos. 40-41; 46-47). In March 2023, Marina PDR's forklift operator photographed hull cracks in López-Marrero's vessel. (ECF Nos. 40 at 5; 46 at 18). According to López-Marrero's deposition, he learned of the hull cracks in June 2023 when his maintenance employee sent him photos.[5] (ECF No. 40-2 at 33-34). On February 8, 2024, Guardian Insurance, López-Marrero's insurer, filed a Complaint

> further certifies that the cradle/rack conforms to the Vessel manufacturer's recommendations for dry storage. Owner shall provide PDR with Vessel builder's dry docking or graving plans ("Plans"). Owner agrees to assume all responsibility for damage to the Vessel from placement of slings, forks, blocks, racks, cradles, or jackstands in the absence of Plans, and holds PDR harmless from any such damages. Owner will be solely liable for any damages sustained by the Vessel while left unattended at launch docks. PDR will not be responsible for any damages or claims arising from Owner's decision to leave the Vessel at the launch docks unattended. Owner shall advise or disclose any conditions on the Vessel which could jeopardize the safety of people or property during Haul out or storage.

(ECF No. 40-1 at 4; 46 at 2).

[5] According to López-Marrero, ever since he purchased the vessel in June 2022, he has had a maintenance employee clean the vessel every two weeks. (ECF No. 40-2 at 34–35).

against him requesting a declaratory judgment. (Case No. 24-1063, ECF No. 1). On February 9, 2024, Marina PDR also filed a Complaint against López-Marrero requesting a declaratory judgment. (ECF No. 1). López-Marrero filed a Counterclaim in both cases. (ECF No. 6; Case No. 24-1063, ECF No. 7). On December 30, 2024, Guardian Insurance and López-Marrero filed a Joint Stipulation for Voluntary Dismissal of Case No. 24-1063, and on January 15, 2025, the Court entered a Final Judgment. (Case No. 24-1063, ECF Nos. 60, 63).

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if it "is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004). A fact is "material" only if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party has the initial burden of "informing the district court of the basis for its motion and identifying those portions" of the record "which it believes demonstrate the absence" of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has satisfied this burden, however, the onus shifts to the non-moving party to show that there is still "a trial worthy issue as to some material fact." *Cortés-Irizarry v. Corporación Insular*, 111 F.3d 184, 187 (1st Cir. 1997).

However, the Court does not act as trier of fact when reviewing the parties' submissions and so cannot "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon" conflicting evidence. *Greenburg v. P.R. Mar. Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987). Rather, the Court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs-Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir. 1990); *accord Maldonado-Denis v. Castillo-Rodríguez*, 23 F.3d 576, 581

(1st Cir. 1994). Additionally, when courts are considering cross-motions for summary judgment, they must "consider each motion separately, drawing all inferences in favor of each non-moving party in turn." *AJC Int'l, Inc. v. Triple–S Propiedad*, 790 F.3d 1, 3 (1st Cir. 2015) (quoting *D & H Therapy Assocs., LLC v. Bos. Mut. Life Ins. Co.*, 640 F.3d 27, 34 (1st Cir. 2011)). A court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

**APPLICABLE LAW**

In cases of admiralty jurisdiction, substantive maritime law applies. *E. River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 864 (1986). However, the exercise of admiralty jurisdiction, "does not result in automatic displacement of state law." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 206 (1996). In cases arising under admiralty jurisdiction, state law may be used to supplement federal maritime law "but may not directly contradict it." *Southworth Mach. Co. v. F/V Corey Pride*, 994 F.2d 37, 41 (1st Cir. 1993); *see also Offshore Logistics v. Tallentire*, 477 U.S. 207, 223 (1986) ("[A]lso in such cases the extent to which state law may be used to remedy maritime injuries is constrained by a so-called 'reverse-*Erie*' doctrine which requires that the substantive remedies afforded by the States conform to governing federal maritime standards.").

Maritime contracts "should be read as a whole and its words given their plain meaning unless the provision is ambiguous." *Weathersby v. Conoco Oil Co.*, 752 F.2d 953, 955 (5th Cir. 1984); *see also Sander v. Alexander Richardson Invs.*, 334 F.3d 712, 716 (8th Cir. 2003) ("Even in maritime law, we construe contracts by giving their terms their normal and everyday meaning. We look to the contract as a whole to determine whether it unambiguously states the parties' intentions."). Furthermore, "[i]nterpretation of the terms of a [maritime] contract is a matter of law." *Weathersby*, 752 F.2d at 956. Under admiralty law, a shipowner may sue in either tort or contract. *La Esperanza De P.R. v. Perez Y Cia. De P.R.*, 124 F.3d 10, 16 (1st Cir. 1997). Admiralty liability may attach by breach of an expressly

assumed obligation or in applicable cases, by breach of an implied warranty such as the implied duty of workmanlike performance. *Id.*

Traditionally, exculpatory clauses were disfavored by admiralty courts, but today, such clauses are routinely enforceable. *La Esperanza De P.R*, 124 F.3d at 19. The rule, as laid out by *La Esperanza* was that "courts today will enforce [exculpatory] clauses that are expressed clearly in contracts entered into freely by parties of equal bargaining power, provided that the clause not provide for a total absolution of liability." *Id.* The rationale for upholding exculpatory clauses that are not overly broad "is predicated upon the consideration that businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk [and allocation of price] than the law would otherwise allow." *Id.*

Later, in *Broadley v. Mashpee Neck Marina, Inc.*, 471 F.3d 272 (1st Cir. 2006), the Court clarified that *La Esperanza* cannot control suits where an exculpatory clause did not specifically reference negligence and was "vastly overbroad and against public policy insofar as it purport[ed] to absolve Marina of liability for gross negligence, recklessness and intentional wrongdoing." *In re Martin*, 596 F. Supp. 2d 142, 152 (D. Mass. 2009) (citing *Broadley*, 471 F.3d at 274–75). Thus, under *Broadley*, "where a contract provision is unlawfully overbroad" a court may "sever or divide provisions that are unlawful as written, retaining those provisions or applications of them that are permissible." *Broadley*, 471 F.3d at 275. The Court's decision in *Broadley* was based on two concerns, (1) the clause was overly broad and could discourage claims for gross negligence or deliberate wrongdoing, and (2) the clause did not convey an effective warning because it never stated the marina was exempted from negligence. *Id.* ("The language used, although broader, is also blander: there is no reference to fault; and, although the clause literally encompasses negligence . . . it is less likely to convey an effective warning to the reader than would a clear and specific disclaimer of liability for negligence.").

Courts sitting in admiralty have distinguished contracts for vessel space from bailment contracts. *See T.N.T. Marine Service, Inc. v. Weaver Shipyards & Dry Docks, Inc.*, 702 F.2d 585, 588 (5th Cir. 1983) ("It has been stated that an admiralty bailment does not arise unless the delivery to the bailee is complete and he has exclusive right to possession of the bailed property, even as against the owner."); *Continental Casualty Co. v. Northside Marina at Sesuit Harbor, Inc. (In re Stanton)*, No. CIV. A. 02-10408-GAO, 2005 U.S. Dist. LEXIS 17942, *33, 2005 WL 2035586, *10 (D. Mass. Aug. 18, 2005) ("But where, as here, the marina simply provides docking space to the boat owners and is not given the exclusive right to control the vessels, no bailment relationship is created."). A bailment is "the delivery of goods by their owner to another for a specific purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled." *Goudy & Stevens, Inc. v. Cable Marine, Inc.*, 924 F.2d 16, 18 (1st Cir. 1991). "A bailee's duties are limited when the owner or his agent or employee remains with the vessel or has access to it." *T.N.T. Marine Service, Inc.*, 702 F.2d at 588; *see also Northern Ins. Co. v. Point Judith Marina, LLC*, 579 F.3d 61, 70 (1st Cir. 2009) ("But this rule admits an exception. '[N]o inference or presumption of negligence can arise against a bailee if [its] possession of the damaged bailed property was not exclusive of that of the bailor.'"). Conversely, a docking space contract does not transfer the control or possession of the vessel, "no bailment relationship is created." *In re Stanton,* 2005 U.S. Dist. LEXIS, *33.

A bailment contract may incorporate a bailee's implied duty of workmanlike performance with respect to the property while in its custody. *Muller Boat Works, Inc. v. Unnamed 52′ House Barge*, 464 F. Supp. 2d 127, 146 (E.D.N.Y. 2006). The workmanlike performance doctrine was first announced by the Supreme Court in *Ryan Stevedoring Co. v. Pan Atlantic S.S. Corp.*, 350 U.S. 124, 100 (1956), and is usually implied in admiralty contracts involving vessel repair. *Fairest-Knight v. Marine World Distribs.*, 652 F.3d 94, 99 (1st Cir. 2011). "[R]ecovery under a breach of an implied warranty of workmanlike

performance claim requires showing that the sub-standard work performed caused the damage claimed." *Id.* (cleaned up) (*citing SS Amazonia v. New Jersey Export Marine Carpenters, Inc.*, 564 F.2d 5, 8 (2nd Cir. 1977)).

## DISCUSSION

### The Parties' Agreement[6]

Marina PDR moved for summary judgment requesting the Court to enter a declaratory judgment in its favor. (ECF No. 41). In support, Marina PDR claims that: (1) the release and limitation of liability clauses in the Agreement are enforceable under admiralty law, (2) the Agreement permits recovery exclusively from the vessel's insurer, (3) that López-Marrero assumed the risk and failed to fulfill his contractual duties, (4) López-Marrero's Counterclaim fails as a matter of law for lack of evidence of gross negligence or willful misconduct, and (5) that expert testimony was required to establish liability and causation. (*Id.*). López-Marrero opposes Marina PDR's motion by arguing that: (1) Marina PDR cannot seek dismissal of the Counterclaim in its entirety, nor can it claim that the

[6] Marina PDR's complaint alleges López-Marrero lacks standing to bring this suit as a subsequent purchaser. (ECF No. 1). Additionally, the record reflects that López-Marrero testified that he initially purchased the vessel for $ 650,000 and received a total of $425,000 from insurance and sale proceeds. (ECF Nos. 60, 63). However, the record does not reflect how much López-Marrero has paid for the vessel in addition to a $50,000 deposit. *Id.* Thus, the amount of López-Marrero's actual loss is currently unknown. "It is well settled that a maritime insurer such as [Guardian], which has paid its insured the amount of a loss, becomes subrogated in a corresponding amount to the insured's cause of action against the person causing the loss and may pursue its claim against such person in either its own name or that of the insured." *Americas Ins. Co. v. Seagull Compania Naviera, S.A.*, 774 F.2d 64, 66 (2nd Cir. 1985). As such, if López-Marrero's loss has been completely covered by Guardian, López-Marrero lost standing to pursue the claim, if any, and only Guardian may pursue López-Marrero's claim under its right to subrogation. *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1117-18 (9th Cir. 2010) ("Subrogation is an equitable doctrine that permits an insurance company to assert the rights and remedies of an Insured against a third-party tortfeasor. The doctrine's purpose is to prevent the insured from obtaining a double recovery (and thus being unjustly enriched) and to place the responsibility for paying the loss on the party who caused the loss.") (citation modified). Nevertheless, Marina PDR's motion for summary judgment does not take up the issue of standing, leaving the Court unable to make a determination in this regard. (ECF No. 41).

exculpatory clauses are limited to ordinary negligence; (2) the exculpatory clauses should be severed in their entirety; (3) there is sufficient evidence of gross negligence on the record to deny Marina PDR's motion; and that (4) Marina PDR's expert argument is inapposite. (ECF No. 47). In sum, Marina PDR requests the Court to enforce the exculpatory clauses under the rule in *Broadley* and López-Marrero, also citing *Broadley*, requests the opposite. *See Broadley*, 471 F.3d at 275.

**A. The Exculpatory Clauses**

The *Broadley* Court explained that a valid exculpatory clause (1) cannot be a total absolution of liability, (2) must clearly convey an effective warning, and (3) must represent fair dealing and equal bargaining power. *Id.* at 274–75. To wit, in the Court's view, "the better rule is that an exculpatory clause limited to barring liability for ordinary negligence would be valid, assuming it were not inflicted by a monopolist or one with greatly superior bargaining power." *Id.* Here, Marina PDR argues all the *Broadley* requirements are met. (ECF No. 41 at 8–10). As explained below, the Court agrees.

**1. Overbreadth**

The Agreement contains exculpatory clauses in Section 19, 20, 21, 22, and 34. (ECF No. 40-1 at 3). López-Marrero claims the exculpatory clauses fail to comply with *Broadley* because (1) "Sections 19-22 designate Mr. López Marrero's insurer, and not the Marina, as the exclusive 'source of recovery for hull losses,' and (2) "Section 34 absolves the Marina of all liability because Mr. López Marrero did not provide the Marina with his Vessel's manufacturer's cradle specifications and supposedly failed to give the Marina notice … that the cradle was allegedly unsuitable for his vessel, even after he had inspected it." (ECF No. 47 at 5) (citation modified). Per López-Marrero, Marina PDR "simultaneously contends that Sections 19–22 and 34 completely absolve the Marina from all liability arising from its own negligence, whether it be ordinary or gross, while at the same time recognizing that those same clauses would be considered overbroad and unenforceable under *Broadley*, supra, unless solely limited to excusing the Marina's ordinary negligence." (*Id.*).

As stated above, Section 19 requires the vessel's owner to purchase and maintain insurance. (ECF No. 40-1 at 3). Section 19 also explicitly states that the "Owner specifically waives, on behalf of Owner and Owner's insurers, all rights of subrogation against the PDR Parties; *except to the extent a claim is caused by the sole negligence, gross negligence or willful misconduct of the PDR parties*." (*Id.*) (emphasis added). Thus, Section 19 is limited to barring liability for ordinary negligence consistent with *Broadley* and *La Esperanza*. *See Broadley*, 471 F.3d at 274 (citing *La Esperanza De P.R.*, 124 F.3d at 19) (noting that its earlier language in *La Esperanza* "may simply mean (unexceptionally) that parties cannot contract out of gross negligence")). By its terms, Section 19 does not preclude a claim for Marina PDR's sole negligence, gross negligence, or willful misconduct. (*Id.*) Therefore, Section 19 is not overbroad. Nor does the Agreement's requirement that claims be filed with an insurance company alter this conclusion. The same clause specifically provides that the waiver of rights or subrogation is only for ordinary negligence. (*See* ECF No. 40-1 at 3, ¶ 19).[7] In other words, the Agreement explicitly provides that claims for sole negligence, gross negligence and willful misconduct fall outside the scope of the exculpatory clause and that, in such a case, an insurance company may be subrogated in the owner's right to compensation. (*See id.*). Consequently, López-Marrero's claim of overbreadth misses the mark as Section 19 does not provide a total absolution of liability. *See Broadley*, 471 F.3d at 274–75.

Meanwhile, Section 20 warns that Marina PDR does not carry insurance covering the owner's property and includes a general waiver of responsibility, providing that no liability will attach "even if such claims arose out of or in connection with the negligence of fault of the PDR parties." (ECF No.

---

[7] Section 19 states: "Owner specifically waives, on behalf of Owner and Owner's insurers, all rights of subrogation against the PDR Parties; EXCEPT TO THE EXTENT A CLAIM IS CAUSED BY THE SOLE NEGLIGENCE, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE PDR PARTIES." (ECF 40-1 at 3).

40-1 at 3). Section 21 establishes an indemnity and hold harmless clause in favor of Marina PDR. (*Id.*). While at first glance these sections appear to support López-Marrero's claims, any doubt is resolved by Section 22, which effectively cabins any exclusions in Sections 20 and 21. *Id.* Section 22 clearly states that "the obligations of owner under paragraphs 20 and 21 shall be enforceable even if damages or claims arise out of or in connection with the negligence or fault of the PDR parties, but not to the extent caused by the sole negligence, gross negligence, or willful misconduct of the PDR parties, which may not be presumed and must be affirmatively established." (*Id.*). Therefore, like Section 19, Sections 20 and 21 are not overbroad. *See Broadley*, 471 F.3d at 274–75; *La Esperanza De P.R.*, 124 F.3d at 19.

For its part, Section 34 appears under the heading "Dry Stack & Haul Out." (ECF No. 40-1 at 4). It imposes a duty on the vessel's owner to determine the type of storage most suitable for his vessel, inspect and certify that Marina PDR's cradle/rack conforms to his vessel's manufacturer specifications, and provide the vessel's dry docking or graving plans to Marina PDR. (*Id.*). It then purports to "hold [Marina] PDR harmless," in part, for any damages to the vessel for its placement absent receipt of the vessel's plans. (*Id.*). Read together, the wind is knocked out of López-Marrero's sails. First, Marina PDR invokes this section precisely because López-Marrero did not turn in the plans for his vessel. (ECF No. 40 at 2). Second, and pertinent in this context, the Agreement is to be read as a whole. *See Weathersby*, 752 F.2d at 955. Section 34 has to be read in conjunction with the liability portion of the Agreement, which as discussed above, clearly delineates that Marina PDR is only excepted from ordinary negligence claims.

For these reasons, the exculpatory clauses in Sections 19, 20, 21, 22, and 34 comply with the requirements set out in *La Esperanza* and *Broadley*. *See Broadley,* 471 F.3d at 274–75; *La Esperanza De P.R.,* 124 F.3d at 19.

**2. Clarity**

The exculpatory clauses in the Agreement also express the limitations on liability with clarity. In *Broadley*, the Court reasoned that a contract's absence of an explicit reference to negligence failed to provide adequate warning. *See Broadley*, 471 F.3d at 276. A valid exculpatory clause must convey an effective warning to the reader of the specific disclaimer of liability for negligence. The Agreement, which consists of four pages, dedicates almost an entire page to explaining the liability disclaimers and the contractual relationship between the Parties regarding ordinary negligence and gross negligence. (*See* ECF No. 40-1 at 3). Additionally, the Agreement includes the limitations in bold and caps lock letters. (*See id.*). As such, the exculpatory clauses in the Agreement are akin to the clause upheld in *La Esperanza* and can be distinguished from the clause severed in *Broadley*. *See La Esperanza De P.R.*, 124 F.3d at 19; *Broadley*, 471 F.3d at 274–75.

**3. Fair Dealing and Equal Bargaining**

Finally, as to the fair dealing and equal bargaining requirement, courts have routinely found no superior bargaining or monopolistic power where vessel owners are free to accept the agreement and have the ability to contract with other marinas in the area. *See In re Wechsler,* 121 F. Supp. 2d 404, 434 (D. Del. 2000) (finding that boat owners were not "at the marina's mercy," instead they "were free to accept or reject the terms" of a slip rental agreement, and if "certain provisions of the contract were not to their liking," they "could have simply moored their vessels at a different marina with a more favorable rental agreement"); *Sander,* 334 F.3d at 720 ("[T]he parties agree that there were several other marinas in the area . . . . None of the boat owners claim that they attempted to negotiate any of the terms of the slip agreement and were unable to do so because of the Yacht Club's superior bargaining power or refusal to negotiate or that they even objected to the exculpatory clause."); *Morgan v. Water Toy Shop, Inc.*, No. CV 16-2540 (PAD), 2018 U.S. Dist. LEXIS 61546, *21, 2018 WL 1725550, *10 (D.P.R Mar. 30, 2018) (noting that "adhesion contracts are 'take it or leave it' contracts with no

opportunity for negotiation between parties with unequal bargaining power" and that this "definition does not fit waivers used in connection with voluntary recreational pursuits rather than rendition of essential services").

Here, López-Marrero was free to accept or reject the Agreement, there is no dispute that there were other marinas in the area on Puerto Rico's east coast, and the liability waivers are in connection with voluntary recreational activities. (ECF No. 47 at 14). Still, López-Marrero opted to store not just the vessel at issue, but four additional boats at Marina PDR. (ECF No. 40 at 5). Furthermore, there is no argument that López-Marrero tried to negotiate or objected to the exculpatory clauses. *See Sander,* 334 F.3d at 720. For this reason, there can be no finding of unfair dealing, unequal bargaining or monopolistic power.

**B. Implied Warranty of Workmanlike Performance and Negligence Claims**

López-Marrero argues that Marina PDR's "devil-may-care" handling of his vessel and its subsequent behavior supports a finding of negligence and even gross negligence because Marina PDR failed to (1) properly care for the vessel, (2) notify López-Marrero of the small cracks on the vessel, and (3) warn its clients that the cradles provided are not suitable for stepped hull vessels. (ECF No. 47 at 19, 23). Per López-Marrero, Marina PDR's conduct amounted to a breach of its duty of care, including a breach of the warranty of workmanlike performance implicit in maritime services contracts. (*Id.*). As detailed below, however, López-Marrero's claim of breach of warranty of workmanlike performance fails as a matter of law, his claims of ordinary negligence are barred by the Agreement, and he fails to marshal sufficient facts to establish gross negligence.

**1. Implied Warranty of Workmanlike Performance**

First, López-Marrero cites caselaw discussing bailment and repair contracts to argue Marina PDR breached its duty to properly care for the vessel, and its duty of workmanlike performance. (ECF

No. 47 at 23). However, such cases are inapposite here because the Agreement specifically provides it is not a bailment contract, and that Marina PDR does not offer nor provide custody services. (ECF No. 40-1 at 4, ¶¶ 29, 43). Furthermore, the doctrine of workmanlike performance only applies to marine services contracts, which typically do involve a bailment, and not to vessel space license agreements where owners retain the custody their vessels. *See Rivera-Domenech v. Perez*, 254 F. Supp. 2d 232, 236 (D.P.R. 2003) (stating that a "presumption of negligence in admiralty cases" exists only once the bailor shows "that the vessel was delivered in good condition and was damaged while in the possession of the bailee" but that this presumption is extinguished if proven that "the bailee did not have the right to exclusive control and possession of the vessel"); *N. Ins. Co. of New York*, 579 F.3d at 67 (implying a warranty of workmanlike performance in an agreement that "effectively required a party to assume maintenance" of a vessel but not in an agreement that "did not obligate [a party] to appraise the overall condition of [a] vessel or search for defects"). Moreover, nothing in the Agreement suggests that Marina PDR, without an obligation to inspect, undertook an obligation to inform boat owners of readily apparent cracks in vessels stored at its premises.

The absence of any contractual duty on Marina PDR to inspect the vessel in the Agreement in conjunction with Marina PDR's lack of exclusive control underscores this point. For example, López-Marrero claims Marina PDR had a duty to warn or disclose the cracks its employee discovered on the vessel. (ECF No. 47 at 19, 23). However, as explained above, Marina PDR had no such duty. (ECF 40-1); *see N. Ins. Co. of New York*, 579 F.3d at 68 (finding no duty on marina to perform "full inspection" and report defects); *Szamier v. Lambs Yacht Ctr. Operating Co., LLC*, No. 3:18-CV-1402-J-20JBT, 2020 U.S. Dist. LEXIS 263936, *24–26, 2020 WL 13389277, *9 (M.D. Fla. Sept. 25, 2020) (finding no duty to warn of dangerous conditions). Furthermore, López-Marrero's claim the Marina PDR failed to disclose the vessel's damage rings hollow when he concedes that the cracks were easily

visible and that his own employee who was responsible for maintaining the vessel and cleaned the vessel every two weeks notified him of the cracks. (ECF No. 40-2 at 34).

Likewise, under the Agreement, Marina PDR had no duty to determine whether the cradle was suitable for the vessel nor did Marina PDR have a duty to alter its existing facilities. Rather, the Agreement placed the duty of determining the cradle's suitability for the vessel on the owner. (ECF 40-1 at 4). López-Marrero cannot prevail on a warranty of workmanlike performance claim where no warranty—explicitly or implicitly—was made to him. *See Villamil-Sordo v. Varadero @ Palmas, Inc.*, No. CV 18-1425 (SCC), 2021 U.S. Dist. LEXIS 171439, *13–14, 2021 WL 4129378, *5 (D.P.R. Sept. 9, 2021) (noting that courts "may not create a contractual duty where one does not exist."); *Matter of Parry*, No. CV 15-10686-LTS, U.S. Dist. LEXIS 107491, *29, 2018 WL 3150218, *11 (D. Mass. June 27, 2018) ("[T]he vessel owner must prove that any breach of the *warranty* was the proximate cause of any actual damages.") (citation modified).

**2. Negligence and Gross Negligence**

The familiar elements of negligence apply in maritime cases. *La Esperanza De P.R.*, 124 F.3d at 16. To prevail, López-Marrero must show that "(1) there was a duty owed to [him] by [Marina PDR]; (2) [that Marina PDR] breached that duty; and (3) [that Marina PDR's] breach caused [his] alleged injuries." *Vinson v. Cobb*, 501 F. Supp. 2d 1125, 1131 (E.D. Tenn. 2007) (citing *Mid-S. Towing Co. v. Exmar Lux*, 418 F. 3d 526, 532 (5th Cir. 2005)). To establish gross negligence López-Marrero must show that Marina PDR engaged in an intentional failure to perform a manifest duty in reckless disregard for the consequences of its acts. *See Royal Ins. Co. of Am. v. Southwest Marine*, 194 F.3d 1009, 1015 (9th Cir. 1999) (noting that such "such a gross want of care and regard for the rights of others" must "justify the presumption of willfulness and wantonness") (citing Black's Law Dictionary (4th ed. 1968)).

On these facts, a factfinder could not reasonably conclude that Marina PDR was grossly negligent. Gross negligence requires a "higher degree of culpability approaching willful or wanton misconduct." *Olivelli v. Sappo Corp., Inc.*, 225 F. Supp. 2d 109, 120 (D.P.R. 2002) (granting summary judgment against a party whose sole evidence of gross negligence was his "own self-serving characterization of the record"). Therefore, even accepting as true that Marina PDR damaged López-Marrero's vessel by improperly storing it, and transporting it with knowledge that it had sustained some damage, these facts do not rise to this higher degree of culpability. *See id.* López-Marrero overstates the severity of Marina PDR's failure to inform him of the cracks first detected in March 2023. As discussed above, Marina PDR had no duty to keep him abreast of what was readily apparent. And the evident failure to communicate, is "more closely approximate a failure to exercise due care, rather than some modicum of reckless abandon." *La Esperanza De P.R.*, 124 F.3d at 20 (affirming a finding of ordinary negligence where a shipyard's faulty repair resulted in extensive damage to a ship including: electrical fires, cracked hull plates, water seepages, and whose improper securing allowed vandals to steal "several radios and liquor from the ship's liquor cabinet"). Nor can López-Marrero bridge this gap with Marina PDR's subsequent actions and/or inaction. Whether or not Marina PDR has informed other boat owners of the unsuitability of its cradle for stepped-hull vessels has no retroactive effect in this case.

Where López-Marrero most closely approaches this standard is Marina PDR's "unilateral decision" to transport the vessel to Island Marine when, at least one of its agents, had knowledge of cracks on the vessel's hull. (ECF No. 47 at 21). But even though López-Marrero claims this move was done "without so much as consulting" him, in breach of standard procedure, his deposition testimony reveals that the reason for this move was that López-Marrero hired Island Marine to repair stains on the vessel, and was therefore fully aware of its move. (ECF No. 40-2 at 28). Regardless of López-Marrero's contention that it was the cradle that caused the damage to the hull, on this record, any

breach by Marina PDR regarding the move and blocking cannot be said to be "tantamount in this case to gross negligence." *La Esperanza de P.R.*, 124 F.3d at 20 ("[W]hile it became apparent that the shipyard eventually abandoned any effort to make good on its contractual undertaking to repair the vessel, we cannot agree that a material breach of contract is tantamount in this case to gross negligence.").

Furthermore, López-Marrero has produced no expert to explain why Marina PDR's actions fell egregiously below any ordinary standard of care. *See In re Stanton*, 2005 U.S. Dist. LEXIS, *33 (holding that expert testimony was required to establish how "conditions [a] the marina fell below approved practices or standards"). Although López-Marrero previous retained experts to determine the extent of the vessel's damage, and indicated that he reserved the right to call experts to testify that point loading likely caused such damage, López-Marrero has offered no trial expert to explain to the jury exactly what the Marina should have done otherwise, considering its limited contractual responsibilities. Indeed, this knowledge is not "within the range of ordinary lay experience." *Id.* "A finding of negligence must not be based upon speculation or mere conjecture" *Id.* (citing 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law*, § 5–2 (4th ed.2004)). Further, the Agreement itself states that gross negligence may "not be presumed and must be affirmatively established." (ECF No. 40-1).

In sum, viewing the record in a light favorable to López-Marrero, Marina PDR's failure to inform him of damage on the vessel's hull, and the vessel's subsequent transportation and blocking, may give rise to the inference of negligence. In fact, Marina PDR concedes as much. (ECF No. 41 at 18). However, absent more, a finding of "willful or wanton" conduct would be a bridge too far. *See Greenburg*, 835 F.2d at 936 (holding that although "evidence manifesting [a] factual dispute" need not be preponderant, it must be substantial). After all, the vessel was not exclusively within Marina PDR's control and under the Agreement it was López-Marrero who had the onus of inspecting and certifying the suitability of the cradle. If more were needed, López-Marrero himself had four other boats with

stepped-hulls stored in Marina PDR's dry stacks and none of them suffered damages. (ECF No. 40-2 at 32). Accordingly, because the Agreement forecloses a claim of ordinary negligence, López-Marrero's Counterclaim fail as a matter of law and Marina PDR's motion for summary judgment on its request for declaratory judgment is **GRANTED**. *See IDC Properties, Inc. v. Chicago Title Ins. Co.*, 42 F.4th 1, 7 (1st Cir. 2022) ("Summary judgment is appropriate if no reasonable factfinder, examining the evidence and drawing all reasonable inferences helpful to the plaintiff, could resolve the dispute in the plaintiff's favor.") (citation modified).

## CONCLUSION

For the reasons stated above, the Court holds the Agreement between the Parties is valid and complies with admiralty law and caselaw. Pursuant to the Court's Opinion and Order, Marina PDR's request for Declaratory Judgment is hereby **GRANTED** and López-Marrero's Counterclaim is hereby **DISMISSED WITH PREJUDICE**. Any motions filed after the pre-established deadlines and oppositions thereto are deemed **MOOT.**

IT IS SO ORDERED.

In San Juan, Puerto Rico, this Wednesday, September 30, 2026.

s/ Mariana E. Bauzá-Almonte

MARIANA E. BAUZÁ-ALMONTE
United States Magistrate Judge